UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES P. RIVA, II,                    )
        Petitioner,                   )
                                      )
            v.                        )        Civ. A. No. 01-12061-MLW
                                      )
EDWARD FICCO,                         )
        Respondent.                   )

MEMORANDUM AND ORDER

WOLF, D.J.                                          August 21, 2014

I.    INTRODUCTION............................................ 2

II.   LEGAL STANDARDS......................................... 5

      A.    The Period of Limitation........................... 5

      B.    Equitable Tolling: In General...................... 5

      C.    Equitable Tolling: On Account of Mental Illness...... 6

      D.    The Equitable Exception for Actual Innocence......... 8

III.  FACTS AND PROCEEDINGS.................................. 10

      A.    The Crime and the Trial........................... 10

      B.    Following the Trial: 1981-1995.................... 12

      C.    The Tolling Period: 1996-1999.................... 17

      D.    Proceedings on the Instant Petition............... 22

      E.    The Parties' Current Positions.................... 26

IV.   ANALYSIS: EQUITABLE TOLLING............................ 29

      A.    The Tolling Period................................ 29

      B.    Additional Information............................ 30

            1.    Expert Medical Opinions....................... 31

            2.    Additional Litigation......................... 33

      C.    Equitable Tolling Is Not Warranted: Key Factors..... 36

            1.    Riva's Litigation of His 1996 Habeas
                  Petition...................................... 37

            2.    Riva's Cooperation with the Preparation of
                  the 1998 Habeas Petition...................... 38

       3.   Riva's Pursuit of Collateral Proceedings
           in State Court.............................. 40

       4.   Riva's Correspondence Concerning his
           Litigation................................. 42

       5.   Riva's Litigation of His 1987 Civil
           Rights Action.............................. 43

       6.   Medical Evidence that Riva Experienced
           Sustained Periods of Lucidity During the
           Tolling Period............................. 44

   D.   Equitable Tolling Is Not Warranted:
       Overall Analysis.................................. 45

   E.   The Court Will Not Treat the Petition as If It
       Was Filed in 1996, Nunc Pro Tunc................... 48

V.   ANALYSIS: ACTUAL INNOCENCE............................. 51

   A.   The Court Is Addressing the Actual Innocence
       Claim............................................. 51

   B.   The Actual Innocence Exception Does Not Apply....... 56

VI.  ANALYSIS: ADDITIONAL ISSUES............................ 64

   A.   The Court Is Not Authorizing Neurodiagnostic
       Testing........................................... 64

   B.   Riva's Letters to Passalacqua Are No Longer
       Privileged........................................ 66

VII. CERTIFICATE OF APPEALABILITY........................... 69

VIII. ORDER.............................................. 71

## I.  INTRODUCTION

On October 28, 1981, petitioner James Riva was convicted of murder and other charges in Plymouth Superior Court. His conviction was affirmed on appeal. See Commonwealth v. Riva, 469 N.E.2d 1307 (Mass. App. Ct. 1984) ("Riva I"). Riva has filed four state court motions for a new trial and three prior federal

petitions for habeas corpus. These motions and petitions were denied.

Riva filed the instant petition under 28 U.S.C. §2254 (the "Petition") on October 15, 2001. The Petition asserts that the representation provided to Riva by his trial counsel was constitutionally ineffective in several ways.

On March 28, 2007, the court denied the Petition. See <u>Riva v. Ficco</u>, Civ. No. 01-12061-MLW, 2007 WL 954771 (D. Mass. Mar. 28, 2007) ("Riva II"). The court determined that the Petition is barred by the one-year period of limitation that governs §2254 petitions. The court found that the period of limitation should not be equitably tolled because, during the relevant period of time, Riva had the mental capacity to pursue his legal affairs effectively.

On appeal, the First Circuit vacated the Order denying the Petition and remanded for further proceedings. See <u>Riva v. Ficco</u>, 615 F.3d 35 (1st Cir. 2010) ("Riva III"). The First Circuit found that the court's analysis of the factual record had been flawed, and provided guidance as to how this analysis should be conducted. In addition, the First Circuit instructed the court to address Riva's claim that his actual innocence excuses any untimeliness.

On remand, the parties have submitted additional briefing, affidavits, and documentary evidence. The court has considered these and prior submissions in light of the First Circuit's guidance and the applicable law, which has recently been updated by the Supreme Court. See McQuiggin v. Perkins, 133 S. Ct. 1924 (2013). For the reasons described in this Memorandum, the court is again finding that the Petition is barred by the applicable period of limitation. Accordingly, the Petition is being denied. The essence of the court's reasoning is as follows.

The Petition was filed more than four years after the applicable statutory deadline had elapsed. The period of limitation was only partially tolled by Riva's most recent state court motion for a new trial. In view of the updated record, examined in accordance with the First Circuit's instructions, Riva has not demonstrated that, during the relevant period of time, his ability to pursue legal redress was impaired to a degree that represented an extraordinary circumstance that stood in his way and prevented timely filing. Accordingly, equitable tolling of the period of limitation is not appropriate.

The court is considering Riva's claim of actual innocence even though this claim has not previously been presented to the state courts. However, Riva's claim of actual innocence does not satisfy the applicable standard defined by the Supreme Court.

More specifically, Riva does not establish that it is more likely than not that no reasonable juror would have convicted him at trial. Riva's actual innocence claim does not, therefore, overcome his failure to comply with the period of limitation.

II.  LEGAL STANDARDS

A.  The Period of Limitation

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act (the "AEDPA") came into effect. The AEDPA subjects petitions for a writ of habeas corpus to a one-year period of limitation. See 28 U.S.C. §2244(d). Petitioners whose convictions became final before the AEDPA's effective date were granted a one-year grace period, running through April 24, 1997, to file any habeas petitions. See Gaskins v. Duval, 183 F.3d 8, 9 (1st Cir. 1999); Rogers v. United Stated, 180 F.3d 349, 351-52 (1st Cir. 1999). The period of limitation is tolled by any "[t]ime during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. §2244(d)(2).

B.  Equitable Tolling: In General

The AEDPA's period of limitation is subject to equitable tolling in appropriate circumstances. See Holland v. Florida, 560 U.S. 631 (2010). Equitable tolling is "the exception rather than the rule; resort to its prophylaxis is deemed justified

only in extraordinary circumstances." <u>Delaney v. Matesanz</u>, 264 F.3d 7, 14 (1st Cir. 2001).

"A habeas petitioner bears the burden of establishing the basis for equitable tolling." <u>Riva III</u>, 615 F.3d at 39 (citing <u>Holland</u>, 560 U.S. at 649); <u>Rios v. Mazzuca</u>, 78 Fed. Appx. 742, 744 (2d Cir. 2005). In order to carry this burden, the petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." <u>Holland</u>, 130 S. Ct. at 2562 (quoting <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418 (2005)); <u>see also</u> <u>Trapp v. Spencer</u>, 479 F.3d 53, 61 (1st Cir. 2007) (listing factors relevant to the equitable tolling analysis).

C.   Equitable Tolling: On Account of Mental Illness

In <u>Riva II</u>, this court noted that the First Circuit had not yet discussed whether and, if so, when a prisoner's mental illness justifies equitable tolling, but that other circuits "have permitted equitable tolling where the petitioner establishes that his mental illness was severe enough to preclude self-representation or effective communication with his counsel." <u>Riva II</u>, 2007 WL 954771, at *4 (collecting cases). "Conversely," the court explained, "courts deny tolling based on mental capacity . . . where the record indicates that an

individual was able to file legal motions and papers on his own behalf or to aid others in doing so." Id.

On appeal, the First Circuit confirmed that "mental illness can constitute an extraordinary circumstance, which may prevent a habeas petitioner from understanding and acting upon his legal rights and thereby equitably toll the AEDPA limitations period." Riva III, 615 F.3d at 40. The First Circuit agreed that mental illness does not automatically toll the AEDPA limitations period. Rather, it does so only if there is "some causal link between a petitioner's mental illness and his ability seasonably to file for habeas relief." Id. The First Circuit stated that:

> [A] habeas petitioner satisfies the causation requirement if he can show that, during the relevant time frame, he suffered from a mental illness or impairment that so severely impaired his ability either effectively to pursue legal relief to his own behoof or, if represented, effectively to assist and communicate with counsel.

Id. The First Circuit cited several standards concerning equitable tolling due to mental illness formulated in previous cases. Notably, the Second Circuit has required that a petitioner "demonstrate that her particular disability constituted an 'extraordinary circumstance' severely impairing her ability to comply with the filing deadline, despite her diligent efforts to do so." Bolarinwa v. Williams, 593 F.3d 226, 232 (2d Cir. 2010); see also Hunter v. Ferrell, 587 F.3d 1304,

1308 (11th Cir. 2009); Laws v. Lamarque, 351 F.3d 919, 923 (9th Cir. 2003); Ata v. Scutt, 662 F.3d 736, 742 (6th Cir. 2011).

D.   The Equitable Exception for Actual Innocence

The period of limitation that governs §2254 petitions may also be overcome by the "miscarriage of justice" or "actual innocence" doctrine. This doctrine creates an "equitable exception," not "an extension of the time statutorily prescribed." McQuiggin, 133 S. Ct. at 1931. It provides "a gateway through which a habeas petitioner [may] have his otherwise barred constitutional claim considered on the merits." Barreto-Barreto v. United States, 551 F.3d 95, 102 (1st Cir. 2008) (quoting Schlup v. Delo, 513 U.S. 298, 315 (1995)). This "gateway" is designed to permit a habeas petition to be examined on the merits if a petitioner has "raised sufficient doubt about [his] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error." Schlup, 513 U.S. at 315.

"Actual innocence" means "factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). An actual innocence claim must be founded on "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." Schlup, 513 U.S.

at 324; <u>House v. Bell</u>, 547 U.S. 518, 537 (2006). The actual innocence exception "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" <u>McQuiggin</u>, 133 S. Ct. at 1933 (quoting <u>Schlup</u>, 513 U.S. at 329); <u>House v. Bell</u>, 547 U.S. 518, 536–37 (2006); <u>Gunter v. Maloney</u>, 291 F.3d 74, 83 (1st Cir. 2002). Actual innocence is "'rare' and [is] only . . . applied in the 'extraordinary case.'" <u>Schlup</u>, 513 U.S. at 321 (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 494 (1986)); <u>Awon v. United States</u>, 308 F.3d 133, 143 (1st Cir. 2002).

The foregoing standard "requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." <u>Schlup</u>, 513 U.S. at 329. The court must make its determination "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." <u>Id.</u> at 328 (quoting Henry J. Friendly, <u>Is Innocence</u>

9

<u>Irrelevant? Collateral Attack on Criminal Judgments</u>, 38 U. Chi. L. Rev. 142, 160 (1970)).

III. FACTS AND PROCEEDINGS

   A.   <u>The Crime and the Trial</u>

   At about 3:00 p.m. on April 10, 1980, Riva visited his grandmother, Carmen Lopez, at her home in Marshfield. Riva and his grandmother had recently argued about Riva's long hair and lack of employment. After doing some washing for his grandmother, Riva went to the cellar of her house and brought up a gun and gold-painted bullets that he had previously hidden there. Riva's grandmother saw the gun and threw a glass at him. He shot her at least twice and stabbed her. He then carried her into her bedroom, poured dry gas over her, and set her on fire. He left the house and drove to pick up his father in Braintree.

   Police recovered a grey metal box from Ms. Lopez's home. The box contained papers belonging to Riva and some gold-painted bullets. Riva made persistent efforts, on the day after the shooting, to retrieve the box from the police. He confronted Lieutenant James Lopes of the Marshfield police about this matter and eventually struck him.

   Riva was arrested and indicted for murder, arson, and assault and battery on a police officer. A Superior Court judge initially found Riva incompetent to stand trial. This

determination was subsequently reversed by Judge Peter F. Brady, who presided over Riva's trial.

Riva was tried by jury in Plymouth County Superior Court in October, 1981. Evidence was submitted at trial indicating that Riva had exhibited troubling behavior from a young age:

> At four, he had an altercation with his father and tried to call the police and, when that was prevented, attempted to injure his father. When hospitalized with pneumonia and later in kindergarten, he drew pictures of bleeding human anatomies and of people being shot. At thirteen he started drawing pictures of vampires and of women with puncture wounds dripping blood. He periodically began eating food with the appearance of blood (mixtures of oil, ketchup, parts of animals).

Riva I, 469 N.E.2d at 1309 n.5. While he was incarcerated, Riva admitted the crimes for which he was tried to his mother, describing the background to them as follows:

> Riva said that he had "been a vampire for more than four years, that was when the voice came out of the sun in the marsh and told me I had to be a vampire, and I have had to drink blood for a long time . . . ." He claimed to have "been talking to the devil for a long time." . . . Riva went on to say that, on the morning of the fire, "the voice told him . . . that was the day he was going to die if he didn't kill his grandmother, and he said he fought with the voice all day, he didn't want to."

Riva I, 469 N.E.2d at 1308 n.3; see also id. at 1309 n.4. Riva's defense at trial was that he lacked criminal responsibility by reason of insanity. He offered considerable expert evidence in support of this claim:

Four psychiatrists of substantial experience, called as expert witnesses by Riva, testified that Riva suffered from serious mental illness. These psychiatrists (as well as some staff psychiatrists who examined Riva at Bridgewater State Hospital and elsewhere, but who did not testify at trial) concluded (with some variations in their reasons) that Riva, on April 10, 1980, lacked criminal responsibility . . . . No one of them was shaken in his conclusions by cross-examination.

* * * *

One such expert witness thought Riva, on April 10, 1980, suffered from a chronic form of schizophrenia, which caused him to lack substantial capacity to conform his behavior to the requirements of law, but that he "did have the capacity to understand the wrongfulness of his act." Two of these doctors expressed the view that Riva suffered from paranoid schizophrenia on the date of the killing. One doctor thought Riva was a "manic depressive," whose "conduct was influenced by delusions and possibly hallucinations."

Riva I, 469 N.E.2d at 1309-10 & n.8 (1984). An expert for the prosecution, Dr. Martin Kelly, opined that Riva suffered from borderline personality disorder, and that he had been criminally responsible for the murder. Id. at 1310 n.11.

On October 28, 1981, the jury found Riva guilty of second-degree murder, arson, and assault and battery on a police officer. He was sentenced to life in prison.

B.    Following the Trial: 1981-1995

Four days after he was sentenced, Riva was committed to Bridgewater State Hospital. He remained at Bridgewater until January 24, 1989. He was then transferred to the general prison

population. While in the general population, Riva assaulted a correctional officer under a paranoid delusion that the officer had been draining fluid from his spine. <u>See</u> Pet'r's Opp'n to Resp.'s Mot. to Dismiss Ex. B, at 7.[1] On September 6, 1990, Riva was sent back to Bridgewater, where he continued to suffer from psychotic symptoms. At times, he was preoccupied with the delusion that he needed to consume human flesh. He was treated with several medications, including Trilafon and Risperdal. <u>Id.</u> at 2; Brower 2006 Aff. ¶¶6-7.

Soon after he was convicted, Riva began to pursue a series of state and federal post-conviction proceedings. Following the trial, Riva's trial counsel, John Spinale, Esq., filed a motion for a new trial and a motion to revise or revoke Riva's sentence. The trial court denied these motions on May 26, 1982. Newly appointed counsel, Willie Davis, Esq., filed an appeal from Riva's conviction and from the trial court's denial of Riva's post-conviction motions. The Massachusetts Appeals Court affirmed. <u>See</u> <u>Riva I</u>. Riva filed an application for leave to

---

[1] A report prepared by Bridgewater staff states that Riva was prosecuted for this conduct and found not guilty by reason of insanity. <u>See</u> Pet'r's Opp'n to Resp.'s Mot. to Dismiss Ex. B, at 1.

obtain further appellate review before the SJC.[2] This application

was denied. See 474 N.E.2d 181 (1985) (table).

In May 1987, acting pro se, Riva filed a second state court

motion for a new trial.[3] Before any action was taken on this

motion, Riva turned to federal court, filing his first federal

habeas petition on July 14, 1987. See Riva v. Noonan, Civ. No.

87-1800-T. The petition was dismissed by Judge Joseph L. Tauro,

who found, adopting the Report and Recommendation of Magistrate

Judge Lawrence P. Cohen, that three of Riva's claims were

unexhausted and that a fourth claim was unmeritorious. See Civ.

No. 87-1800-T, Oct. 7, 1987 Order (adopting Aug. 10, 1987 Report

and Recommendation).[4]

Riva returned to state court, filing a new version of his

second motion for a new trial, with an accompanying memorandum

---

[2] Respondent was unable to obtain this application. See
Suppl. Answer at 1. It is, therefore, likely but not certain
that the application was filed by Mr. Davis.

[3] The motion asserted three grounds for relief,
including: "(2) Two major constitutional infractions on the part
of trial judge Brady: (a) Compelling the defendant to sit in a
prisoner's dock. (b) Requiring the jury prove the defendant not
guilty in the charge." Trial Ct. Docket No. 133.

[4] Riva II, 2007 WL 954771, at *3 n.3, and Riva III, 615
F.3d at 38, incorrectly assume that this decision was appealed
and that it was affirmed in Riva v. Getchell, 873 F.2d 1434 (1st
Cir. 1989) (table). As explained below, Riva v. Getchell was a
separate action filed under 42 U.S.C. §1983.

of law, on June 2, 1988.[5] The trial court appointed new counsel, Dana Alan Curhan, Esq., to represent Riva. Mr. Curhan filed an amended motion for a new trial on July 19, 1990. The motion was denied by the trial court on February 28, 1991. Curhan filed an appeal to the Massachusetts Appeals Court, which affirmed. See 615 N.E.2d 606 (1993) (table). An application for leave to obtain further appellate review was denied. See 618 N.E.2d 1364 (1993) (table).

On August 2, 1993, pro se, Riva filed a second motion to revise or revoke his sentence.[6] This motion lay dormant for three

---

[5]     Riva's memorandum of law states, in part:

Firstly, the defendant argues it was unconstitutional for Justice Brady to compel him to sit in a prisoners dock for the length of his trial and that a new trial should therefore be granted, Walker v. Butterworth 599 F2d 1074. . . . The defendant further argues that a taped interrogation was allowed into evidence void of a Miranda warning. . . . [N]ote also that a transcript certified by a court reporter is deemed prima facie, a correct statement of the testimony taken and the proceedings had, U.S. v Ochs 548 F Supp 502.

Trial Ct. Docket No. 135, Mem. of Law at 1-2. Walker and Ochs are appositely cited.

[6]     In this motion, Riva wrote, in part:

For reason that the court should resentence him, the defendant says that the prosecutor, who had more knowledge of the case than anyone else, only recommended that the two sentences (second degree murder and arson) be run concurrent while the court opted to run them on and after in spite of the overwhelming evidence at the trial that the defendant suffered from a mental illness that diminished his culpability.

years. During this time, on May 11, 1995, Riva filed a third

motion for a new trial. He was now represented by Richard

Passalacqua, Esq. Riva wrote at least two letters to

Passalacqua, commenting on the motion that Passalacqua had

prepared and, subsequently, on the Commonwealth's opposition to

Passalacqua's motion.[7] The third motion for a new trial was

---

Trial Ct. Docket No. 160, at 1.

[7]    In his first letter, dated April 25, 1995, Riva wrote, in part:

> I am in receipt of the copy of my rule 30 that you mailed to me. I think it is good as long as you are positive sure that the trial judge in the Superior Court has no jurisdiction to hear a claim of ineffective assistance of appellate counsel. . . . As long as you're sure, it's okay. You're the one who's been to law school, I'm just a jailhouse lawyer.

> There is one noteworthy technical mistake. We are citing Com v Moore as a the precedent for putting on the record the judges reasons for confining a defendant to a prisoner's dock. There are eight Com v. Moores in the Massachusetts Digest. The judge probably knows which one we are talking about, but I really think you should put in the numerical cites. Comm v. Albert Francis Moore Jr. 393 NE2d 904. . . .

> I did a terrible thing, but there should be some consideration by the court for mental impairment. My prognosis is good as long as I stay on my meds . . . .

Resp.'s Addendum at 265. Riva's second letter, dated July 25, 1995, reads, in part:

> I am in receipt today of the Commonwealth's brief that you sent. Now we had many discussions about the Commonwealth's opening argument and I wrote you many letters concerning the an issue not raised is deemed waived unless you use the issue of ineffective assistance of counsel. You assured me that it is only an issue for the appeals court. I want you to

denied on August 7, 1995. Pro se, Riva filed a notice of appeal and an application for direct appellate review by the SJC. His appeal was dismissed for lack of prosecution on February 23, 1996. The state court docket does not reflect action on Riva's application for direct appellate review.

C.   The Tolling Period: 1996-1999

For reasons explained below, Riva's condition and actions during the period from 1996 to 1999 require particularly close analysis. Riva remained at Bridgewater during this period. He suffered setbacks and troublesome episodes, including paranoid delusions, thoughts about cannibalism, preoccupations with sadistic behavior, paranoia, and heightened vigilance. See Packer Remand Aff. ¶7; Pet'r's Remand Mem. at 10-13 (quoting quoting Resp.'s Addendum at 104-07, 193-94); Resp.'s Addendum at 45-49, 59-62, 203, 208-09.

However, over the course of his hospitalization, Riva had "a slow but gradual improvement in level of psychosis and agitation." Pet'r's Opp'n to Resp.'s Mot. to Dismiss Ex. B, at 1. A report prepared by Bridgewater staff in August, 1999 states that: "For the past twenty-four months [Riva's] behavior has

---

immediately file a rebuttal brief stating your
authorities for this claim. You might not think this
appeal is winnable in front of Brady, but I do.

Id. at 266 (typographical error in original).

17

been essentially non-problematical. He has become more organized and future oriented." Id. at 11. From 1996 through 1999, according to Riva's expert witness, Riva's "level of functioning continued to improve overall and he did not display acute psychotic symptoms or become grossly disorganized." Brower Remand Aff. ¶10. In fact, during this time Riva "act[ed] as a lawyer for other patients, researching and doing clerical work for them." Packer Remand Aff. ¶18 (quoting Bridgewater reports). During the first half of 1999, Riva began taking a new medication, Zyprexa. In August of that year, he was again assigned to the general prison population.

Riva continued to pursue his case during the period 1996-1999. After the Massachusetts Appeals Court dismissed his appeal from the denial of his third motion for a new trial, Riva turned his attention back to his second motion to revise or revoke his sentence, which he had filed on August 2, 1993 but which had not yet been acted on. On September 30, 1996, Riva wrote a letter to Judge Brady, pointing out that his motion was still pending. The Commonwealth then moved to quash Riva's motion, and Riva, still unrepresented, filed an opposition to the motion to quash.[8] On

---

[8]     Riva wrote in his opposition, in part:

The specific language of Mass. rules of Crim Proc. #29(a) allows for revision of revocation if filed within 60 days of rescript. The defendant complied

October 28, 1996, Judge Brady denied Riva's motion to revise or revoke, finding that he had no jurisdiction to consider it.

On February 1, 1996, Riva returned to federal court and filed a second pro se habeas petition, which was assigned to this court. See Riva v. Dubois, Civ. No. 96-10273-MLW. This petition was prepared on a standard form for habeas petitions, but Riva attached to his petition: several exhibits, including an informative sketch of the layout of the trial courtroom; a motion to proceed in forma pauperis; an affidavit in support of the motion to proceed in forma pauperis; and a 10-page typewritten memorandum of law. Riva stated in his memorandum that "[t]he authorship of this appeal [sic] is possible through the use of 32 milligrams of Perphenazine per day which keeps the applicant's symptoms in remission and allows him to think clearly." Civ. No. 96-10273-MLW, Applicant's Mem. of Law at 3.[9]

with this rule filing his motion within days after rescript was received by the trial court. To apply a Federal interpretation of a similar Federal rule would go against the Massachusetts Constitution which has always broadened the protections it affords it's citizens.

Resp.'s Addendum at 288 (typographical error in original).

[9] Riva's handwritten petition and typewritten memorandum present seven grounds for relief in some detail. The first ground for relief, for example, is described in the petition as follows:

Petitioner was confined to a prisoner's dock during trial. The entrance was guarded by an armed court

19

Riva's 1996 habeas petition was not served on the respondent, and no answer was filed. On May 24, 1996, Riva mailed a letter to the clerk's office stating that the respondent had defaulted.[10] One month later, he filed a formal motion for entry of default. However, on July 8, 1996, the case

> officer. He was escorted by the arm to and from the dock by a court officer in view of the jury. The Court made no finding on the record why the dock was necessary. Petitioner requested on the record to sit at counsel table. Petitioner could not communicate with counsel because of the arrangement.

Civ. No. 96-10273-MLW, §2254 Petition at 5. Riva expanded on the basis for his arguments in his memorandum of law, stating, for example, that:

> [T]he main onus is upon the Court for not setting forth on the record why such a security measure was necessary as has been required ever since 1976 when this rule was established in <u>Com v. Moore 393 NE2d 904 (1976)</u>, where it was held that the use of the prisoner's dock was permissable in cases where security demanded it, however, the reasons for ssuch a method must be put on the record and counsel for the defendse and the Commonwealth may be heard . . . . Hon. Brady did not do this. In <u>Walker v Butterworth 599 F2d 1974 (1979)</u> a full three years before the aplicant's trial, it was decided that the use of the prisoner's dock was unconstitutional. Trial counsel had a burdern to object, but he did not. This was ineffective asistance of counsel as if he had objected, the defendant would be entitled to a new trial, <u>Com v Callahan 700 F2nd 32, 33 (1983)</u> . . . Further, there were no curative instructions to the jury not to draw any negative inference from the defendant being seated in the dock . . . .

Civ. No. 96-10273-MLW, Applicant's Mem. of Law at 4-5 (typographical errors in original). The cited cases are again apposite, although <u>Walker</u> begins on page 1074, not 1974.

[10]    Riva apparently reviewed his typewritten letter before submitting it, correcting a typographical error in pen.

was dismissed on the grounds that Riva had not filed a return of service. Riva moved for reconsideration, arguing correctly that, as reflected in a prior Order issued in that proceeding, the clerk is required to effect service in habeas cases. The court agreed, reopened the case, and instructed the clerk to serve the respondent. <u>See</u> Civ. No. 96-10273-MLW, Aug. 8, 1996 Order. Subsequently, Riva moved to dismiss his petition without prejudice, stating that some of the grounds for the petition may have been unexhausted. The court allowed the motion and dismissed the petition without prejudice on February 21, 1997.

On January 6, 1998, a third habeas petition was filed on Riva's behalf by Barbara Smith, Esq. <u>See</u> <u>Riva v. Nelson</u>, Civ. No. 98-10008-MLW.[11] On December 29, 1998, this petition was transferred to the First Circuit on the grounds that it was a "second or successive" habeas petition. The First Circuit ordered Riva to file an application for leave to file a second or successive petition.[12] On October 28, 1999, after Riva had failed to take further action, the First Circuit dismissed his case for failure to prosecute.

_____

[11]     As explained below, the First Circuit in <u>Riva III</u>, 615 F.3d at 38, 43, was misled to conclude that this petition was filed by Ms. Smith's associates after her death, possibly without Riva's consent.

[12]     At the time, the First Circuit mistook Riva's petition for a motion under 28 U.S.C. §2255 by a prisoner in federal custody. <u>See</u> 1st Cir. No. 99-1071, Oct. 28, 1999 Judgment.

While his third habeas petition was before the First Circuit, Riva again returned to state court. On March 17, 1999, he filed his fourth and last motion for a new trial.[13] He was not represented. This motion was denied on December 13, 1999. Riva filed an appeal, which was denied, <u>see</u> 752 N.E.2d 242 (2001) (table), followed by an application for leave to obtain further appellate review, which was denied as well, <u>see</u> 752 N.E.2d 240 (2001) (table).

D.    <u>Proceedings on the Instant Petition</u>

The instant Petition was filed, <u>pro</u> <u>se</u>, on October 15, 2001. Riva makes four claims in the Petition, each premised on a theory of ineffective assistance of counsel. He argues that his trial counsel failed: (1) to object to Riva's forced medication during trial; (2) to object to the trial court's restriction of Riva to the prisoner's dock during trial; (3) to prepare the expert defense witnesses adequately; and (4) to challenge material misrepresentations by the prosecution's expert witness, Dr. Kelly. Initially, Riva raised two additional issues: trial counsel's failure to request a manslaughter instruction, and his failure to object to the trial court's instruction that "the

---

[13]    In a March 31, 1999 letter to Judge Brady, Riva described his efforts to submit his motion by mail, and stated: "If you will notice, I am using the ineffective assistance of counsel angle to some of the previous issues." Resp.'s Addendum at 432.

defendant must be proven innocent." Riva has since abandoned these additional claims. <u>See</u> Pet'r's Opp'n to Resp.'s Mot. to Dismiss at 17 n.8.

On November 7, 2003, Riva sought the First Circuit's permission to file a second or successive habeas petition. The First Circuit denied the request without prejudice, stating that it is not clear that any prior §2254 petition filed by Riva was adjudicated on the merits.

Respondent moved to dismiss, arguing that the Petition is time-barred, that Riva is not entitled to equitable tolling, and that Riva's claims are procedurally defaulted. On October 21, 2005, the court allowed Riva's motion for the appointment of counsel. Randolph Gioia, Esq. was appointed as Riva's attorney on December 1, 2005. Mr. Gioia sought and obtained authorization for funding to engage a medical expert, Dr. Montgomery Brower. After requesting and receiving six extensions, Mr. Gioia filed an opposition to respondent's motion to dismiss. The opposition argued that the period of limitation was tolled statutorily by Riva's state court proceedings and equitably by his mental illness; that Riva's procedural default, too, was excused by Riva's mental illness, as well as by ineffective assistance of counsel; and that both the period of limitation and Riva's

procedural default are overridden by Riva's actual innocence. The opposition was supported by an affidavit by Dr. Brower.

On March 29, 2007, the court allowed respondent's motion to dismiss. The court found that the period of limitation was only partly tolled by Riva's fourth state court motion for a new trial. The court also found that mental illness can in some cases justify equitable tolling, but did not do so in the instant case, stating that:

> Between 1985 and 1999, Riva, in cooperation with counsel, filed a direct appeal, as well as four motions for a new trial in state court, and four pro se habeas petitions. Moreover, between 1996 and 1999, Riva made three filings, on his own volition, pro se: (1) his 1996 motion for a new trial; (2) his 1998 petition for habeas corpus; (3) his 1999 petition for habeas corpus. The fact of these filings indicates that Riva possessed sufficient lucidity during the period 1996 to 1999 to make submissions to the courts.

Riva II, 2007 WL 954771, at *5. The court also noted that "Riva has been shown to have above average intelligence." Id. The court did not address Riva's contention that his actual innocence excused the Petition's untimeliness.

At Riva's request, the court issued a certificate of appealability, see Aug. 27, 2008 Mem. & Order, and Riva appealed. On appeal, the First Circuit confirmed that mental illness can, in some cases, justify equitable tolling. See Riva III, 615 F.3d at 39-40. However, the First Circuit found that

24

this court's analysis of the factual record in this case was flawed in several ways. Id. at 42. Among other things, the First Circuit stated that:

> [T]he court's analysis of [Riva's] filings contains several factual errors. The court stated that [Riva] filed four pro se habeas petitions between 1985 and 1999. In fact, [Riva] filed three habeas petitions during that interval, only two of which were filed pro se. The court further stated that [Riva] made three pro se filings during the tolling period, referencing a 1996 motion for new trial, a 1998 petition for habeas corpus, and a 1999 petition for habeas corpus. There was no 1996 pro se motion for new trial. . . . [T]here was a 1998 habeas petition, but it was not filed pro se. There was no habeas petition filed in 1999.

Id. at 42-43 (citations omitted). In addition, the First Circuit stated that the proceedings initiated by Riva "must be weighed in context," taking into account Riva's substantive filings in those proceedings and whether he abandoned the proceedings or pursued them through completion. Id. at 43.

The First Circuit added that the court erred by relying "on the fact of the petitioner's filings as opposed to either their content or their quality." Id. The court also failed "to consider whether the counseled filings enjoyed the petitioner's effective participation." Id. A final error, according to the First Circuit, was the court's "reliance on a report of the petitioner's intelligence," since "[t]here is no necessary correlation between intelligence and sanity." Id. at 44.

25

The First Circuit, therefore, vacated the court's judgment and remanded "for further development of the record with a view toward determining whether the petitioner's mental illness so severely impaired his ability effectively to pursue legal relief, either on his own behalf or through counsel, as to warrant equitable tolling of the AEDPA limitations period." Id. The First Circuit stated that "[t]his is a complex case, in which various pieces of evidence point in different directions," that "[i]t is a close call as to whether or not equitable tolling is warranted," and that the First Circuit "do[es] not suggest what that call ultimately should be." Id. The First Circuit also instructed that, on remand, Riva's actual innocence argument should be considered in addition to his equitable tolling argument. Id. at 44 n.4.

E.    The Parties' Current Positions

Riva is now represented by counsel, Elizabeth Billowitz, Esq. On remand, each of the parties has filed two memoranda. Each memorandum is accompanied by an expert's affidavit. Respondent has also filed a two-volume Addendum collecting documentary evidence. A hearing was held on March 14, 2014. Before and after the hearing, the parties submitted several additional documents that had been missing from the record.

Respondent asserts that the record does not indicate that Riva's poor mental health prevented him from effectively pursuing his legal claims. Respondent's submissions are supported by affidavits by Dr. Ira Packer, a forensic psychologist. Dr. Packer reviewed Riva's medical records and legal writings, particularly those composed between 1996 and 1999. In Dr. Packer's opinion, Riva's condition had improved sufficiently by that period that Riva was then capable of the sustained lucidity necessary to pursue his legal claims.

Respondent argues that Riva's actual innocence claim should also be rejected. He contends, first, that the factual contentions that support this claim should not be considered, because they have not been presented to the state courts. Moreover, according to respondent, even if Riva's factual assertions are considered, they do not satisfy the applicable legal standard.

Riva's submissions are supported by affidavits by Dr. Brower. Based on Dr. Brower's opinion, Riva maintains that although his overall functioning had indeed improved by 1996, his "persistent underlying thought disorder continued to substantially affect his mental status." Pet'r's Remand Mem. at 14 (quoting Brower Remand Aff. at 8). Riva objects to respondent's reference to the letters written by Riva to his

attorney, Mr. Passalacqua, arguing that these letters are privileged. Id. at 20 n.6; Pet'r's Suppl. Remand Mem. at 3 n.2.

Riva also contends that his 1996 habeas petition should not have been dismissed, but should, rather, have been stayed in order to allow Riva to exhaust his remedies in state court. Riva suggests that in order to rectify this error, the court should, as an alternative to equitable tolling, treat the current Petition as if it were filed in 1996, nunc pro tunc. See Pet'r's Remand Mem. at 21-25.

In Riva's view, the court may consider his actual innocence claim even though the relevant facts were not presented to the state courts. He argues that the limits on the record that may be considered by a habeas court apply only to substantive habeas claims, not to the "gateway" argument that a petitioner's actual innocence overcomes his procedural lapses. Id. at 35-37. In the alternative, Riva requests that the court stay the current proceedings in order to permit Riva to exhaust his actual innocence argument in state court. Id. at 37 n.15.

Finally, Riva reports that Dr. Brower recommends that he undergo brain imaging and additional neurodiagnostic tests. Riva contends that evidence obtained in such tests would be admissible, and that these tests should, therefore, be authorized. Id. at 38-39.

IV.  ANALYSIS: EQUITABLE TOLLING

A.  <u>The Tolling Period</u>

Riva's direct appellate proceedings concluded in 1985, before the AEDPA's effective date of April 24, 1996. Riva was, therefore, statutorily required to submit any habeas petition within the AEDPA's one-year grace period, which ended on April 24, 1997. He did not file the Petition until October 15, 2001.

The period from April 24, 1996 to October 15, 2001 was partly tolled by Riva's fourth motion for a new trial, which was a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim." 28 U.S.C. §2244(d)(2). That motion was filed on March 17, 1999, and remained pending until June 7, 2001, when the SJC denied Riva's application for leave to obtain further appellate review.[14]

Riva's other state court motions did not toll the period of limitation. Proceedings on Riva's third motion for a new trial ended with the Massachusetts Appeals Court's dismissal of his

---

[14]   In <u>Riva II</u>, the court assumed that Riva's fourth motion for a new trial tolled the time until December 13, 1999, when that motion was denied by the trial court. <u>See</u> <u>Riva II</u>, 2007 WL 954771, at *4. The First Circuit pointed out that the interval until the SJC's denial of Riva's application for leave to obtain further appellate review was tolled as well. <u>See</u> <u>Riva III</u>, 615 F.3d at 41 & n.3.

appeal on February 23, 1996, before the AEDPA came into effect. Riva's second motion to revise or revoke his sentence was filed in 1993, long after the period designated for the filing of such motions had elapsed. <u>See</u> Massachusetts Rule of Criminal Procedure 29(a). This motion did not, therefore, toll the period of limitation, because it was not a "properly filed" application for collateral review. <u>See</u> <u>Riva III</u>, 615 F.3d at 41.

Accordingly, the period during which Riva was required to file any habeas petition encompasses the 34 months from April 24, 1996 to March 17, 1999, as well as the four months from June 7, 2001 to October 15, 2001. Riva concedes that the latter span is not equitably tolled. <u>See</u> <u>Riva III</u>, 615 F.3d at 41. In order for the Petition to be timely, Riva must, therefore, establish that approximately 26 months of the time from April 24, 1996 to March 17, 1999 are subject to equitable tolling; the First Circuit referred to this as the "tolling period." <u>Id.</u> at 41.

B.   <u>Additional Information</u>

The court's examination of Riva's request for equitable tolling is necessarily based, in large part, on the history of Riva's efforts to litigate his case, as described earlier. However, the record also contains additional relevant information, as follows.

## 1. *Expert Medical Opinions*

The court has now received three reports from Riva's expert, Dr. Brower, and two from respondent's expert, Dr. Packer. Both doctors are capable experts. They have both analyzed Riva's medical records as well as materials written by him, particularly submissions to the state and federal courts. Dr. Brower also conducted an in-person examination of Riva in 2006. See Brower 2006 Aff. ¶3.[15]

The experts have focused their analyses on Riva's condition during the tolling period. Their reports explain, as indicated earlier, that Riva suffered setbacks and troublesome episodes during this period, including the following.

In April 1996, Riva was described by Bridgewater staff as having "grossly impaired" judgment. He requested a transfer to maximum security because of "increased anxiety, paranoid ideation, [and] increase in homicidal dreams." He continued to work on his "issues of cannibalism, sadism, and using people." Pet'r's Remand Mem. at 11 (quoting Resp.'s Addendum at 104-07). A June 12, 1996 report states that Riva's symptoms include "extensive delusions . . . that include auditory and visual hallucinations." Riva reported that he "still get[s] temptations

---

[15] Respondent reports that Riva declined to participate in an examination by Dr. Packer. See Resp.'s Remand Mem. at 4 & n.2.

31

to drink blood," though no urge to "procure live flesh." Resp.'s Addendum at 34-36.

A June 20, 1997 report describes Riva as having recently been increasingly "preoccupied with fantasy and covert activity." According to the report, although Riva's illness was in partial remission, he continued to exhibit mood instability, preoccupation with sadistic behavior, and paranoid delusions. Id. at 45-49. In late 1997, Riva continued to think "about putting pieces of brain in [his] mouth" and to dream about vampires. Id. at 59-62.

In July 1998, a progress note observed that Riva's "insight [was] much more impaired than suspected," and that his behavior was "becoming more peculiar." Bridgewater staff questioned whether Riva was "becoming psychotic -- increased paranoia and increased vigilance." Pet'r's Remand Mem. at 12 (quoting Resp.'s Addendum at 193-94). In October 1998, after being transferred to a "max" unit, Riva reported that he was "thinking about spinal fluid." Resp.'s Addendum at 203, 208-09.

However, the parties' experts agree that Riva's condition had improved appreciably by the tolling period; he had, as noted earlier, undergone "a slow but gradual improvement in level of psychosis and agitation," and during his last years at Bridgewater he was "essentially non-problematical" and "more

32

organized and future oriented." Pet'r's Opp'n to Resp.'s Mot. to Dismiss Ex. B, at 1, 11. The experts agree that Riva experienced substantial periods of lucidity during the tolling period. Dr. Brower states that "during the period from April 1996 to March 1999 . . . Mr. Riva's mental status and level of functioning continued to improve overall and he did not display acute psychotic symptoms or become grossly disorganized." Brower Remand Aff. ¶10. Riva himself has averred that: "Between 1990 and 1999, before taking Zyprexa, I experienced periods of lucidity during which I was able to read, write, and think about my legal case." Riva 2006 Aff. ¶4. Dr. Packer opines, more forcefully, that:

> [T]he residual symptoms that have been described in his Bridgewater State Hospital records would not have impaired Mr. Riva's ability to pursue legal action during the relevant period (April 1996-March 1999). For the majority of this period, Mr. Riva was able to think and act coherently, and act in his own self-interest. He was not described as confused, disorganized, or so preoccupied with delusional beliefs as to be unable to rationally focus on his legal issues.

Packer Remand Aff. ¶22.

> 2. *Additional Litigation*

During the years since his trial, in addition to helping other inmates with their legal affairs and filing various challenges to his own conviction, Riva also initiated additional

33

legal proceedings. As explained further below, such proceedings are significant even if they were conducted before the tolling period, because Riva's mental condition during the tolling period was better than it had previously been.

In 1987, as mentioned earlier, Riva filed a suit under 42 U.S.C. §1983 in federal court. See Riva v. Getchell, Civ. No. 87-1467-S. Acting pro se, Riva alleged in that suit that the defendants, state prison officials, repeatedly violated Bridgewater grievance procedures, specifically by failing to grant Riva an interview with the hospital superintendent. Riva argued that the Bridgewater grievance procedures "have the force of law under Mass. Gen. Laws ch. 124 section 1(q)."[16] Civ. No. 87-1467-S, Compl. ¶4. Riva attached 21 supporting exhibits to his complaint.

The defendants filed a motion to dismiss or for summary judgment, arguing primarily that under the Bridgewater grievance procedures, the superintendent has discretion to decline to hear a grievance himself. Judge Walter J. Skinner rejected this argument, finding Riva's interpretation of the grievance procedures more persuasive. See Civ. No. 87-1467-S, Nov. 23,

---

[16] This statute provides that the Massachusetts commissioner of correction "shall . . . make and promulgate necessary rules and regulations incident to the exercise of his powers and the performance of his duties . . . ."

34

1987 Mem. at 2-3. Upon receiving further briefing, however, the court found that the grievance procedures do not create a constitutionally protected interest. Riva's case was, therefore, dismissed. See Riva v. Getchell, Civ. No. 87-1467-S, 1988 U.S. Dist. LEXIS 17938 (D. Mass. Mar. 24, 1988).

Riva appealed, and the First Circuit affirmed. See Riva v. Getchell, 873 F.2d 1434 (1st Cir. 1989) (table).[17] Riva then sought certiorari, which was denied. See 493 U.S. 866 (1989). Finally, Riva filed a petition for reconsideration of the decision denying certiorari. This petition was denied as well. See 496 U.S. 986 (1989).

The record also includes various documents from a suit initiated by Riva against state officials, including Francis Tees II, in 1986. See Resp.'s Addendum at 352-373, 378-401, 404-415. Riva claimed in that suit that he had been dismissed from work in the hospital kitchen due to libelous allegations that he had poisoned a correctional officer's coffee.[18] The history of

---

[17]    As indicated above, this decision did not -- as assumed by Riva II and Riva III -- concern an appeal from the denial of Riva's 1987 habeas petition.

[18]    At oral argument in that case, Riva contended that:

I don't make any claim that, to have a constitutional right to be employed as a prisoner. I'm merely claiming that as a result of a libelous claim by one of the defendants I've been dismissed from my job in the kitchen. The libelous claim was to the effect that I poisoned the coffee, and this isn't true.

that suit is difficult to discern from the documents before the court, and respondent was unable to provide a more organized and informative set of documents. See Resp.'s Resp. to Order of Mar. 9, 2014 at 1-2. An updated docket sheet provided by respondent does state, however, that the suit was "[d]isposed: by Settlement." Id. Ex. 8, at 1.

C. Equitable Tolling Is Not Warranted: Key Factors

The First Circuit has explained that the court must consider the following factors, among others, in its analysis of whether equitable tolling is warranted: the content and quality of Riva's filings; whether these filings were made pro se or with the help of counsel; and the manner in which Riva subsequently pursued the proceedings he had initiated. In addition, the record now includes the additional materials described earlier.

Riva's legal proceedings between 1996 and 1999 shed a particularly direct light on the extent to which Riva was capable of pursuing his legal affairs during the tolling period. However, the court is also taking into account Riva's filings and other actions before 1996. As explained earlier, Riva's mental condition during the tolling period was better than it had previously been. Consequently, effective litigation by Riva

Resp.'s Addendum at 408.

prior to 1996 tends to indicate that Riva had a similar capacity to pursue his legal affairs during the tolling period.

As explained further below, the court finds that Riva has not satisfied his burden of establishing that equitable tolling is warranted in this case. The key factors that support this determination are the following.

1. *Riva's Litigation of His 1996 Habeas Petition*

Riva's 1996 habeas petition is the first of the two proceedings initiated during the tolling period.[19] Riva acted pro se throughout the proceedings on this petition. He stated in a memorandum submitted with his petition that he was able to pursue habeas relief due to medication that "keeps [his] symptoms in remission and allows him to think clearly." Civ. No. 96-10273-MLW, Applicant's Mem. of Law at 3. As described earlier, Riva's detailed submissions included informative exhibits and a memorandum of law citing relevant case law.

Riva was attentive to the litigation of his 1996 petition. After the petition had not been answered for several months, Riva mailed a letter to the clerk's office stating that the respondent had defaulted. He followed up by filing a formal motion for entry of default. When the petition was erroneously

---

[19] In addition to these new proceedings, in September-October 1996, Riva also revived and litigated his second motion to revise or revoke his sentence.

dismissed for failure to file a return of service, Riva persuaded the court to reinstate it.

Ultimately, Riva moved to dismiss his petition because of a well-founded concern that some of his claims were unexhausted. In hindsight, it might have been better if Riva had requested a stay of proceedings on his petition. However, his decision to seek dismissal was not illogical, particularly because the AEDPA had only recently been enacted, and the practice of holding in abeyance "mixed" petitions containing exhausted and unexhausted claims was, consequently, not established. See Rhines v. Weber, 544 U.S. 269, 274-76 (2005). The content and history of the 1996 habeas petition, therefore, indicate that Riva was capable of engaging in lucid, sustained litigation during the tolling period.

>        2.   *Riva's Cooperation with the Preparation of the
>             1998 Habeas Petition*

Riva represented to this court and to the First Circuit that he took no part in the litigation of his 1998 habeas petition. Rather, according to Riva, his father hired Barbara Smith, Esq. to prepare the petition and, when Ms. Smith passed away before completing this task, her firm filed the petition in her place. See Pet'r's Am. Br. at 15; Pet'r's Opp'n to Resp.'s Mot. to Dismiss at 3; 1st Cir. No. 07-1998, Appellant's Br. at

13. The First Circuit credited Riva's representations. <u>See</u> <u>Riva</u> <u>III</u>, 615 F.3d at 38, 43.

Riva's account of the circumstances surrounding the 1998 habeas proceeding has since been disproved. Ms. Smith died on November 23, 1998, approximately ten months after the petition was filed. <u>See</u> Resp.'s Reply at 11 n.5, Ex. 3. Ms. Smith's signature appears on the petition and on a letter submitted with it. The petition is also signed, under penalty of perjury, by Riva himself.[20] In addition, the grounds for relief asserted in the 1998 petition are similar to those that Riva continues to assert today.

It is true that the 1998 petition was not pursued <u>pro se</u>, and that it was ultimately dismissed for lack of prosecution. There is also little information available concerning the depth of Riva's cooperation with Ms. Smith. However, considering Riva's signature on the 1998 petition; the similarity of the arguments presented in the petition to those that Riva has asserted on his own behalf; Ms. Smith's reputation as a careful and ethical professional; and the falseness of the version of events that Riva originally offered -- the 1998 petition now supports the conclusion that Riva was capable of meaningfully

---

[20]    At the March 14, 2014 hearing, Riva's counsel reported that Riva now recalls signing the petition after insistent exhortations by Ms. Smith that he do so.

cooperating with an attorney in the pursuit of his legal
interests during the tolling period.

3. *Riva's Pursuit of Collateral Proceedings in State
Court*

Riva filed his fourth motion for a new trial in March 1999.
Both parties agree that by that time, Riva was able to pursue
his legal affairs effectively. <u>See</u> Resp.'s Remand Mem. at 8-10;
Pet'r's Remand Mem. at 7; Riva 2006 Aff. ¶¶8-9. Consequently,
the content of Riva's fourth motion for a new trial and the
history of its litigation are not valuable indicators of Riva's
abilities during the tolling period.

Riva's three prior motions for a new trial and his two
motions to revise or revoke his sentence are more instructive.
As described earlier, the litigation of these motions involved
efforts by several court-appointed attorneys. Although Riva
subsequently criticized the representation provided by some of
his attorneys, he was apparently able to work with them. Riva's
cooperation with his attorneys is evidenced by, among other
things, his correspondence with Mr. Passalacqua, discussed
further below.

Riva's state court litigation also involved <u>pro</u> <u>se</u>
submissions by Riva, including: his second motion for a new
trial, filed in different versions in May 1987 and on June 2,
1988; his second motion to revise or revoke his sentence, filed

on August 2, 1993; and his notice of appeal and application for direct appellate review concerning the trial court's August 7, 1995 denial of his third motion for a new trial. These submissions are excerpted, in footnotes, supra. They are generally organized and comprehensible, and to varying degrees, they anticipate the claims that Riva has continued to assert in subsequent proceedings. Dr. Brower opines that "the form and content of Mr. Riva's pleadings, while organized and rational, also reflects the concrete, rigid and obsessional nature of Mr. Riva's thinking, as he essentially reduplicates the same rote content time after time in his multiple pleadings." Brower Remand Aff. ¶12. However, the reiteration of similar arguments in successive filings is common in protracted litigation, and it indicates to this court consistency rather than obsessive rigidity.

Although Riva failed, in 1995, to prosecute his appeal from the denial of his third motion for a new trial, this failure was not typical of his pattern of litigation. Aided by Mr. Spinale and by Mr. Davis, Riva litigated his first motion for a new trial and his first motion to revise or revoke his sentence through an appeal and an application for leave to obtain further appellate review. When a year had elapsed and his second motion for a new trial, filed in May 1987, was not acted on, Riva filed

another version of that motion, this time with the result that Mr. Curhan was appointed to represent him. With Mr. Curhan's help, the second motion for a new trial was also pursued through an appeal and an application for leave to obtain further appellate review. In addition, after Riva's second motion to revise or revoke his sentence, filed on August 2, 1993, was not acted on, Riva brought the motion to the attention of the trial judge, with the result that the motion was revived and resolved. Overall, therefore, Riva has shown an ability to file proceedings as necessary and to pursue them to a final decision.

4. *Riva's Correspondence Concerning his Litigation*

The record contains several letters written by Riva in the course of his legal proceedings. Riva's letters to Mr. Passalacqua are particularly instructive. As quoted in part earlier, these letters display Riva's active involvement in the litigation conducted by his counsel. They also indicate that Riva's understanding of some of the demands of his litigation efforts was at least as sound as that of his professional counsel. For example, as mentioned earlier, a year before the tolling period, in his April 25, 1995 letter, Riva pointed out that: "There are eight Com v. Moores in the Massachusetts Digest. The judge probably knows which one we are talking about, but I really think you should put in the numerical cites."

42

Resp.'s Addendum at 265. Riva contends that his letters to Mr. Passalacqua are protected by the attorney-client privilege. However, as discussed below, this argument is not meritorious.

In addition, the record contains letters mailed by Riva to the Superior Court judge, Peter Brady, and to the District Attorney's office. See Resp.'s Addendum at 429-36, 440-42. These letters indicate that Riva was attuned to the progress of his proceedings and sought to ensure that they did not become dormant. For example, in a September 30, 1996 letter, Riva pointed out to Judge Brady that his second motion to revise or revoke his sentence had not yet been resolved. Some of Riva's letters indicate that Riva believed that prison officials, his mother, or both were interfering with his mail. Id. at 430, 432, 435. However, this apparent delusion did not hamper his efforts to litigate his motions and petitions.

   5.   *Riva's Litigation of His 1987 Civil Rights Action*

Riva's litigative efforts were not limited to challenges to his conviction and sentence. He also brought more than one suit against prison officials. The history of Riva's 1987 action under 42 U.S.C. §1983, which Riva litigated pro se throughout, provides evidence that Riva was capable of pursuing litigation to completion. After the district court, which had first ordered additional briefing, was persuaded to dismiss his action, Riva

43

appealed; when the First Circuit affirmed, Riva sought certiorari; when certiorari was denied, Riva moved for reconsideration. As explained earlier, Riva's ability to maintain extended legal proceedings before 1996 is instructive as to his ability to do so during the tolling period as well, because his mental condition during the tolling period was better than it had previously been.

6. *Medical Evidence that Riva Experienced Sustained Periods of Lucidity During the Tolling Period*

There is no doubt that Riva has suffered from a persistent and severe mental illness. However, his condition improved appreciably by 1996. See Pet'r's Opp'n to Resp.'s Mot. to Dismiss Ex. B, at 1, 11. While Dr. Brower and Dr. Packer differ in their ultimate assessments of Riva's ability to pursue his legal affairs during the tolling period, they agree that Riva experienced substantial intervals of lucidity and acuity during this time. Dr. Packer opines that for the majority of the tolling period, Riva "was able to think and act coherently, and act in his own self-interest." Packer Remand Aff. ¶22. Riva himself states that "[b]etween 1990 and 1999, before taking Zyprexa, [he] experienced periods of lucidity during which [he] was able to read, write, and think about [his] legal case." Riva 2006 Aff. ¶4; see also Brower Remand Aff. ¶10.

44

D.    Equitable Tolling Is Not Warranted: Overall Analysis

Concluding its decision to remand the instant case for further proceedings, the First Circuit instructed this court to examine "whether the petitioner's mental illness so severely impaired his ability effectively to pursue legal relief, either on his own behalf or through counsel, as to warrant equitable tolling of the AEDPA limitations period." Riva III, 615 F.3d at 44. In view of the Supreme Court's general equitable tolling doctrine, equitable tolling is warranted if Riva's mental illness amounted to an "'extraordinary circumstance [that] stood in his way' and prevented timely filing." Holland, 130 S. Ct. at 2562 (quoting Pace, 544 U.S. at 418). Similarly, the Second Circuit has stated that a petitioner in circumstances like Riva's must "demonstrate that her particular disability constituted an 'extraordinary circumstance' severely impairing her ability to comply with the filing deadline." Bolarinwa, 593 F.3d at 232. Riva bears the burden of establishing that equitable tolling is warranted. See Riva III, 615 F.3d at 39 (citing Holland, 560 U.S. at 649).

On the basis of the record as a whole, the court concludes that Riva has not satisfied his burden of showing that his mental illness hampered his ability to pursue redress so severely as to constitute an "extraordinary circumstance" that

45

justifies equitable tolling. As described earlier, the key factors that support this conclusion include: (a) Riva's rational and engaged litigation of his 1996 habeas petition; (b) his cooperation with the litigation of the 1998 habeas petition filed by Ms. Smith, although that petition was ultimately dismissed for failure to prosecute; (c) his determined litigation of motions for a new trial and motions to revise or revoke his sentence in state court, both with the help of counsel and pro se; (d) the fact that, for the most part, Riva's pro se pleadings are clear, organized, and germane; (e) Riva's attuned letter-writing in the course of his litigation; (f) his ability to pursue his federal §1983 action, pro se, through decisions by the district court, the First Circuit, and the Supreme Court; and (g) the medical evidence that Riva experienced substantial periods of lucidity and acuity during the tolling period.

Riva contends that his case is comparable to Benn v. Greiner, 275 F. Supp. 2d 731, 373-74 (E.D.N.Y. 2003). See Pet'r's Remand Mem. at 15. However, the legal proceedings filed by the petitioner in Benn were made "with the help and at the behest of fellow inmates." 275 F. Supp. 2d at 374. "Prison doctors hope[d] that some day, upon his release from prison, [Benn] 'could be expected to understand and apply simple

46

directions,' and 'execute simple but not complex directions with supervision.'" Id. Riva's history is not similar.

Riva's circumstances are more comparable to those of the petitioners in other cases cited by this court in Riva II. First, in Bilbrey v. Douglas, 124 Fed. Appx. 971, 973 (6th Cir. 2005), the petitioner continued, "even during the periods when [her] mental condition appears to have been the most impaired . . . to file litigation in the state courts," including a pro se post-conviction petition in the trial court, an amended post-conviction petition, a notice of appeal to the state court of appeals, and an application for permission to appeal to the state supreme court. See 124 Fed. Appx. at 973. The Sixth Circuit concluded that the petitioner "failed to establish a causal connection between her mental condition and her ability to file a timely petition." Id.

Similarly, in Price v. Lewis, 119 Fed. Appx. 725, 726 (6th Cir. 2005), the petitioner "actively pursued his claims during the limitations period by seeking and obtaining help completing legal paperwork." 119 Fed. Appx. 726. The Sixth Circuit found that the petitioner had "failed to carry his burden to persuade us that his case presents the exceptional circumstances justifying equitable tolling." Id. at 727.

Finally, in <u>Biester v. Midwest Health Servs.</u>, 77 F.3d 1264, 1268 (10th Cir. 1996), a Title VII case, the Tenth Circuit denied a request for equitable tolling where "the evidence demonstrate[d] that, in spite of his mental condition, [the plaintiff] 'was capable of pursuing his own claim'" by requesting a right-to-sue notice from the Equal Employment Opportunity Commission, informing his attorney that he had received the right-to-sue notice, and delivering the notice to his attorney's office. <u>See</u> 77 F.3d at 1268.

Like the litigants in <u>Bilbrey</u>, <u>Price</u>, and <u>Biester</u>, Riva has not established that his mental illness amounted to an "extraordinary circumstance" that severely injured his ability to comply with the AEDPA's period of limitation. <u>See</u> <u>Bolarinwa</u>, 593 F.3d at 232. Accordingly, equitable tolling of the period of limitation is not warranted.

E.    <u>The Court Will Not Treat the Petition as If It Was</u>
      <u>Filed in 1996, Nunc Pro Tunc</u>

As an alternative to equitable tolling, Riva suggests that the court should treat his Petition as if it was filed in 1996, <u>nunc</u> <u>pro</u> <u>tunc</u>. Riva argues that his 1996 habeas petition should not have been dismissed; rather, it should have been stayed for exhaustion purposes. According to Riva, the court should rectify this error by viewing the Petition as if it were filed in the place of the 1996 petition.

48

Several authorities from other circuits suggest that a court may treat a habeas petition as essentially the continuation of a prior petition that was erroneously dismissed. See Newell v. Hanks, 283 F.3d 827, 834 (7th Cir. 2002); Anthony v. Cambra, 236 F.3d 568, 574 (9th Cir. 2000); Calderon v. United States Dist. Ct., 163 F.3d 530, 540 (9th Cir. 1998). Even assuming, without finding, that the reasoning of these authorities would be adopted by the First Circuit, it does not apply to the current case. In Newell, Anthony, and Calderon, the later habeas petition was filed soon after the dismissal of the prior petition. In those circumstances, the Seventh and Ninth Circuits reasoned that the district court could permissibly view the later filing as an effort to reopen or amend the earlier petition. See Newell, 283 F.3d at 831-32; Anthony, 236 F.3d at 571; Calderon, 163 F.3d at 533. This line of reasoning is not applicable to Riva's case, in which the current Petition was filed nearly four years after the earlier petition had been dismissed and in which an additional petition, namely the 1998 petition filed by Ms. Smith, was adjudicated in the interim. Under these circumstances, the Petition cannot reasonably be viewed as the continuation of Riva's 1996 petition.

In addition, Newell, Anthony, and Calderon address circumstances in which the prisoner's initial petition was

dismissed erroneously. See Newell, 283 F.3d at 834; Anthony, 236 F.3d at 574; Calderon, 163 F.3d at 541. Riva contends that this court erred in dismissing his 1996 petition as well. This contention is not correct. It is true that the federal courts have adopted a policy that favors, in certain circumstances, the entry of a stay where a habeas petition includes exhausted and unexhausted claims. See Rhines, 544 U.S. at 278; DeLong v. Dickhaut, 715 F.3d 382, 387 & n.4 (1st Cir. 2013). A district court may even be required to grant a stay if a petitioner who satisfies the relevant conditions requests one. See Rhines, 544 U.S. at 278; Nowaczyk v. Warden, New Hampshire State Prison, 299 F.3d 69 (1st Cir. 2002). Riva did not request a stay, however; rather, he asked the court to dismiss his petition.[21] The court's acquiescence in this request was not erroneous, even if a request for a stay might also have been granted.[22]

_____

[21]     It is also unclear whether Riva would have satisfied the conditions for a stay. A stay may only be entered if the petitioner "had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that [he] engaged in intentionally dilatory litigation tactics." Rhines, 544 U.S. at 278; Josselyn v. Dennehy, 475 F.3d 1, 4 (1st Cir. 2007). It is an open question whether, at least, Riva had "good cause for his failure to exhaust."

[22]     The Second Circuit has held, on one occasion, that a district court erred in failing to stay a habeas petition even though the petitioner had moved for dismissal. See Zarvela v. Artuz, 254 F.3d 374 (2d Cir. 2001). However, Zarvela preceded Rhines, in which the Supreme Court held that stays for

In summary, in the First Circuit, a district court may have discretion to treat some habeas petitions as if they stand in the place of an earlier petition filed by the same prisoner. However, even if this approach is permissible under some circumstances, it is not appropriate in the instant case -- both because the dismissal of Riva's 1996 petition was not erroneous, and because several years passed and an intervening habeas petition was filed between the dismissal of that earlier petition and the filing of the current Petition.[23]

V.    ANALYSIS: ACTUAL INNOCENCE

A.    <u>The Court Is Addressing the Actual Innocence Claim</u>

Respondent contends that the court should not consider Riva's actual innocence claim, because the factual basis for this claim has never been presented to the state courts. <u>See</u>

_____

exhaustion purposes are appropriate only in limited circumstances. In addition, the Second Circuit's conclusion that a stay was mandated in <u>Zarvela</u> was rooted in the unique circumstances of that case: there, the petition had been filed two days before the end of the period of limitation, and it was dismissed after the period had run. <u>See</u> 254 F.3d at 377. Indeed, the Second Circuit stated that "a district court would generally have discretion whether to stay the exhausted claims of a mixed petition or dismiss the entire petition." <u>Id.</u> at 382.

[23]    At the March 14, 2014 hearing, Riva suggested that, alternatively, his Petition could be viewed as if it had been filed on January 6, 1998, the date on which Ms. Smith submitted the petition she had prepared. However, in addition to the fact that this date itself is after the AEDPA's grace period, Riva has not suggested that the 1998 petition was dismissed in error.

51

Resp.'s Remand Mem. at 14-15. Respondent relies, in part, on Cullen v. Pinholster, 131 S. Ct. 1388 (2011), which holds that habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits." Id. at 1398. Respondent's position is not persuasive.

Section 2254 provides that ordinarily, a writ of habeas corpus may not be granted unless the petitioner "exhausted the remedies available in the courts of the State." §2254(b)(1)(A).[24] In Pinholster, the Supreme Court extended the logic of the exhaustion requirement to undeveloped evidence:

> Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo.

131 S. Ct. at 1398-99; see also Atkins v. Clarke, 642 F.3d 47, 49 (1st Cir. 2011). The Court's reasoning in Pinholster focuses on preventing a petitioner from "overcom[ing] an adverse state-court decision with new evidence." Id. Riva does not seek to use new evidence to overcome the state courts' decisions, however. Rather, he seeks to use this evidence to overcome a procedural

---

[24]    Exhaustion is not required if "there is an absence of available State corrective process" or if "circumstances exist that render such process ineffective to protect the rights of the applicant." §2254(b)(1)(B).

hurdle that is intrinsic to federal habeas proceedings. The grounds on which Riva seeks to overturn the state courts' decisions are his ineffective assistance of counsel claims, which have been exhausted in the state courts.

The imposition of a strict _Pinholster_-type requirement on the presentation of new evidence in support of an actual innocence claim would also run counter to the thrust of the actual innocence doctrine. Because of the "concern about the injustice that results from the conviction of an innocent person," _Schlup_, 513 U.S. at 325, the Supreme Court has permitted actual innocence claims "to overcome various procedural defaults," _McQuiggin_, 133 S. Ct. at 1931. These defaults include "'successive' petitions," "'abusive' petitions," "failure to observe state procedural rules," and "failure to develop facts in state court." _Id._ at 1931-32. A doctrine that allows actual innocence claims to overcome these procedural flaws but bars the assertion of actual innocence claims because of similar imperfections would be paradoxical.

Applying similar reasoning, several courts have determined that _Pinholster_ does not preclude habeas petitioners from relying, for the purposes of threshold issues, on evidence not developed in state courts. _See_ _Ata_, 662 F.3d at 742 (the restrictions on the presentation of evidence imposed by the

AEDPA and by <u>Pinholster</u> "do not apply to the equitable tolling issue"); <u>High v. Nevens</u>, Civ. No. 11-00891-MMD, 2013 WL 1292694, at *9 (D. Nev. Mar. 29, 2013) ("The rule in <u>Pinholster</u> of course has no bearing whatsoever on . . . non-merits factual development, under <u>Schlup</u> or otherwise."); <u>Washington v. Beard</u>, Civ. No. 07-3462, 2012 WL 1033526 (E.D. Pa. Mar. 28, 2012) (finding that <u>Pinholster</u> does not bar factual discovery on an actual innocence claim); <u>Rivas v. Fischer</u>, 687 F.3d 514, 530-31 (2d Cir. 2012) (discussing with approval an evidentiary hearing on a petitioner's actual innocence claim).

The First Circuit has held that "any ineffective assistance [of counsel] claim must be itself exhausted before it may be used to excuse a procedural default of another federal claim." <u>Yeboah-Sefah v. Ficco</u>, 556 F.3d 53, 76 (2009) (citing <u>Lynch v. Ficco</u>, 438 F.3d 35, 46 (1st Cir. 2006)). Respondent suggests that this statement indicates that a substantive ground for habeas relief cannot be rescued by another claim that is itself procedurally flawed.

This reading of <u>Yeboah-Sefah</u> is erroneous. <u>Yeboah-Sefah</u> contends with a petitioner's argument that the procedural default of his habeas claim was caused by ineffective assistance of counsel. This argument is the natural reaction of a petitioner who discovers that his habeas claim has been

54

defaulted. A rule permitting this argument to overcome the bar on procedurally defaulted claims would, therefore, "render the exhaustion requirement 'illusory.'" Costa v. Hall, 673 F.3d 16, 25 (1st Cir. 2012) (quoting Edwards v. Carpenter, 529 U.S. 446, 452 (2006)). Consequently, the First Circuit has held that a petitioner seeking to excuse procedural default must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Id. (quoting Carrier, 477 U.S. at 488).

The concern about rendering procedural requirements illusory does not extend to cases in which an actual innocence claim is asserted for the purpose of rescuing a procedurally flawed habeas petition. An actual innocence claim necessarily requires a showing of "objective factors" external to the relevant procedural flaw. The standard that governs showings of actual innocence is demanding, and "a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare." Schlup, 513 U.S. at 324. The court, therefore, does not interpret Yeboah-Sefah to impose the universe of procedural requirements that govern substantive habeas petitions on gateway claims of actual innocence.

Accordingly, the court is addressing Riva's claim that his actual innocence excuses his failure to comply with the AEDPA's

period of limitation, including the evidence and factual assertions underlying this claim that have not been litigated in state court.

B.   The Actual Innocence Exception Does Not Apply

The Supreme Court has stated that the actual innocence doctrine is limited to "factual innocence, not mere legal insufficiency." Bousley, 523 U.S. at 623. "[C]ircuit courts differ on whether a complete affirmative defense to a crime -- such as insanity or self-defense -- shows factual or only legal innocence." Rozzelle v. Sec'y, Florida Dep't of Corr., 672 F.3d 1000, 1013-14 (11th Cir. 2012). The Tenth Circuit has categorized a petitioner's argument that "his conduct is justified or mitigated by the doctrines of self-defense or heat of passion" as a claim of legal innocence, not factual innocence. See Ellis v. Hargett, 302 F.3d 1182, 1186 n.1 (10th Cir. 2002); see also Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000) ("The [actual innocence] exception is intended for those rare situations where the State has convicted the wrong person of the crime . . . ."). Relatedly, the Eleventh Circuit has ruled that a petitioner's claim that he is "guilty of only a lesser degree of homicide" does not support an actual innocence claim. See Rozzelle, 672 F.3d at 1015.

Other circuits have reached contrary conclusions. The Fifth Circuit has held that a petitioner asserting an affirmative defense of "necessity" is potentially actually innocent, not merely legally innocent. See Finley v. Johnson, 243 F.3d 215 (5th Cir. 2001). The Ninth Circuit has reached the same conclusion with regard to a petitioner who claimed to have acted in self-defense. See Jaramillo v. Stewart, 340 F.3d 877 (9th Cir. 2003). More directly on point, the Seventh Circuit has held that an insanity defense can support a claim of actual innocence:

> Suppose [the petitioner] were the public executioner, prosecuted for the "murder" of a capital defendant whom [the petitioner] had lawfully executed; he would be actually innocent even though he had, as it were, pulled the trigger. It is the same, we think, when the accused murderer has an affirmative defense of insanity. If acquitted on grounds of insanity, he is actually innocent.

Britz v. Cowan, 192 F.3d 1101, 1103 (7th Cir. 1999) (citing Wilson v. Greene, 155 F.3d 396, 405 (4th Cir. 1998)). Similarly, in a case in which medical experts testified that the petitioner was "incapable of deliberation at the time of the killing," the Eighth Circuit held that the petitioner's "alleged incapacity to form the predicate deliberative intent, without which he could not have been found guilty of capital murder, differentiates his

claim from one of mere legal innocence." <u>Jones v. Delo</u>, 56 F.3d 878, 883 (8th Cir. 1995).

The current case does not require a resolution of the circuit split as to whether the actual innocence doctrine applies to affirmative defenses, including insanity. Assuming, without finding, that an insanity defense can support an actual innocence claim in appropriate cases, the court finds that Riva has not made a sufficient showing of actual innocence by reason of insanity.

The actual innocence exception applies only where "it is more likely than not that no reasonable juror would have convicted." <u>McQuiggin</u>, 133 S. Ct. at 1933 (quoting <u>Schlup</u>, 513 U.S. at 329). An actual innocence claim must be based on "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324; <u>House</u>, 547 U.S. at 537. Riva currently presents two pieces of "new evidence" of his actual innocence. His request to gather and present additional evidence is analyzed separately below.

Riva's first putative piece of new evidence is the expert opinion of Dr. Brower that the prosecution's expert witness at trial, Dr. Kelly, "minimized, and at times mischaracterized, the

nature and significance of Mr. Riva's mental illness." Brower 2006 Aff. ¶11. According to Dr. Brower, Dr. Kelly: erroneously stated that Riva had not been observed suffering an "acute psychotic reaction"; failed to address a 1974 diagnosis of Riva that had indicated "schizophrenia, latent type," a term "formerly used to describe patients now most likely to be described as having schizotypal personality disorder"; mistakenly concluded that Riva suffers from borderline personality disorder; and understated the severity of the effect that psychotic symptoms have on a patient's daily life. Id. ¶¶12-17.

The other piece of evidence that Riva offers in support of his actual innocence claim is an IQ test that was administered to Riva, apparently in September 1978.[25] This IQ test shows "'intra subtest scatter,' (that is, not performing consistently within any subtest, for instance getting easier items wrong, but correctly answering harder items)." Packer Remand Aff. ¶29. It also reveals "inter-test variability," namely a discrepancy between Riva's verbal IQ (103, in the average range) and his performance IQ (123, in the superior range). See Brower Remand

---

[25] There has been some confusion as to when the test was administered. See Brower 2006 Aff. ¶18 (September 1974); Packer Remand Aff. ¶¶24, 27 (September 1978); Packer Suppl. Remand Aff. ¶11 (same); Pet'r's Remand Mem. at 32 n.12 (1979).

Aff. ¶18; Brower 2006 Aff. ¶18. In Dr. Brower's opinion, these results "comprise part of an overall pattern of deficits in left hemisphere functioning that research has consistently identified as associated with schizophrenia." Brower Remand Aff. ¶20.

Each of these pieces of evidence suffers from certain shortcomings. Dr. Brower's evidence is not, in fact, "new," in the sense that it overlaps with the testimony offered at trial by Riva's four expert witnesses. See Riva I, 469 N.E.2d at 1309-10 & n.8. In addition, Dr. Packer explains that Riva's 1978 IQ test is less significant than it may appear to be: in Dr. Packer's view, while "the more relevant issue was the 'intra subtest scatter,'" Riva's performance IQ score on the 1978 test "may have been elevated due to practice effect," namely due to the fact that that test was the third IQ test administered to Riva in the span of a few years. See Packer Remand Aff. ¶¶28-29. Dr. Packer also states that "scores on an IQ test do not constitute a major element in the diagnosis of Schizophrenia." Id. ¶30.

More crucially, Riva's new pieces of evidence do not directly sustain the proposition that Riva was not guilty by reason of insanity. Massachusetts law has adopted the definition of insanity stated in the Model Penal Code:

> A person is not responsible for criminal conduct if at time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law.

Commonwealth v. McHoul, 226 N.E.2d 556, 557-58 (Mass. 1967) (quoting Model Penal Code §4.01); see Riva I, 469 N.E.2d at 1309-10 & n.7. The question of whether a defendant "lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law" is distinct from the question of whether that defendant suffers from a particular medical condition. Moreover, the legally relevant inquiry cannot generally be decided conclusively through expert medical analysis:

> A defendant's sanity comes to trial in cases where psychiatrists can and do hold and state opposing views. All such cases show that psychiatry is far from an exact science and that whether a defendant is to be called sane or insane cannot depend on any certain measurement. . . . In any but the extreme case, where there will be no controversy, no expert can speak with scientific certainty and no jury can or does act on the assumption that some of the experts in the case have done so.

McHoul, 226 N.E.2d at 561 (citing Commonwealth v. Hartford, 194 N.E.2d 401, 405-06 (Mass. 1963)).

Riva's case fits the account presented by the SJC in McHoul. Five experts provided the jury with their opinions. Four

of the experts disagreed with the prosecution's expert, Dr. Kelly. They opined that Riva suffered from schizophrenia or manic depression accompanied by delusions and possibly hallucinations, and concluded that Riva was not guilty by reason of insanity. Riva's new evidence tends to support these propositions, specifically the conclusion that Riva was a schizophrenic at the time of the murder. This new evidence does not, however, make it more likely than not that no reasonable juror would have rejected Riva's claims of insanity and convicted him. See McQuiggin, 133 S. Ct. at 1933.

The jury implicitly concluded that although, as all five experts agreed, Riva suffered from a significant mental illness, he did not lack "substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law." In reaching this conclusion, the jury likely relied not solely on Dr. Kelly's opinion, but also on other evidence, including: the testimony of witnesses who had had unremarkable conversations with Riva on the day of the murder; a tape recording of an interview with Riva conducted on the day after the murder, in which Riva denied any involvement and suggested alternative possible causes for the fire at his grandmother's home; and Riva's attempt to retrieve the box containing his papers and gold-painted bullets

from the police. <u>See</u> Trial Tr. 311-313, 371-86, 474-76, 879-82, 995-98. The jury's conclusion that Riva did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law is not undermined by the additional evidence of Riva's schizophrenia provided by Dr. Brower or by Riva's 1978 IQ test.

In view of "all the evidence," Riva has not established that "it is more likely than not that no reasonable juror would have convicted." <u>Schlup</u>, 513 U.S. at 328-29. Rather, as the Massachusetts Appeals Court determined on Riva's direct appeal:

> Upon all the conflicting evidence . . . it was open to the jury, as fact finders, to conclude that the Commonwealth had established beyond a reasonable doubt that Riva had criminal capacity when he killed his grandmother.

<u>Riva I</u>, 469 N.E.2d at 1310; <u>cf.</u> <u>Britz</u>, 192 F.3d at 1104 (although insanity would have constituted actual innocence, habeas relief was not warranted where the jury did not credit the testimony of three experts who testified for the defense). Accordingly, the actual innocence exception to the period of limitation is not applicable in the instant case.

VI.  ANALYSIS: ADDITIONAL ISSUES

A.   The Court Is Not Authorizing Neurodiagnostic Testing

Riva asks for "the opportunity to supplement the record with additional neurodiagnostic testing," including brain imaging studies. See Pet'r's Remand Mem. at 39.[26] He asserts that the proposed testing "quite possibly would shed light on the state of his brain at the time of the offense." Id.; Brower Remand Aff. ¶21. Because Riva is indigent, the question of the admissibility of evidence from such testing would arise only if the court were to authorize funding for this testing under the Criminal Justice Act, 18 U.S.C. §3006A.

"[I]nvestigative, expert, or other services necessary for adequate representation" should be authorized if the court "find[s], after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them." 18 U.S.C. §3006A(e)(1); see also §3006A(a)(2)(B) (extending the right to representation to eligible habeas petitioners if "the interests of justice so

---

[26]    It is respondent's understanding that Riva also wishes to present evidence at an evidentiary hearing. See Resp.'s Reply at 12 (citing Pet'r's Remand Mem. at 8). However, Riva has not explicitly requested an evidentiary hearing in his recent written submissions or at the March 14, 2014 hearing. In any event, he has not identified any additional relevant evidence that could be presented at such a hearing.

require"). Riva did not present his request for authorization to conduct neurodiagnostic testing _ex parte_, but rather in public filings. Because the court is denying the Petition, its denial of Riva's request to conduct neurodiagnostic testing will, in any event, be evident. Accordingly, the court is explaining its reasons for denying this request in this public Memorandum. These reasons are similar to the reasons that support the rejection of Riva's actual innocence claim on the existing record, as explained earlier.

The testing that Riva proposes to undergo could, perhaps, bolster the conclusion that Riva has "an observable brain abnormality associated with schizophrenia." Brower Remand Aff. ¶21. This testing might support the conclusion that Riva suffered from a detectible mental illness that was present both at birth and at the time of the offense. Id. ¶22.

However, any such findings would not necessarily imply that Riva was actually innocent of the crimes attributed to him. Dr. Brower acknowledges that "no neurodiagnostic test can prove a diagnosis of schizophrenia." Brower Remand Aff. ¶21. Moreover, it is likely that the jury did, in fact, believe, on the basis of the testimony of Riva's experts, that Riva suffered from schizophrenia. The jury's implicit conclusion was, however, that Riva did not "lack[] substantial capacity either to appreciate

the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law." <u>McHoul</u>, 226 N.E.2d at 557-58. The question of whether such a conclusion is appropriate cannot generally be resolved by expert psychiatric analysis. <u>Id.</u> at 561. Dr. Brower concedes as much, stating that "no diagnosis or test result can be validly offered as showing the requisite mental state for legal insanity." Brower Suppl. Remand Aff. ¶4. Even if evidence of the character that Riva hopes to acquire could affect the deliberations of a jury to some degree, such evidence could not establish that "it is more likely than not that no reasonable juror would have convicted." <u>McQuiggin</u>, 133 S. Ct. at 1933; <u>Schlup</u>, 513 U.S. at 329.

The neurodiagnostic testing requested by Riva is, therefore not "necessary" within the meaning of §3006A(e)(1), in the sense that it cannot foreseeably affect the outcome of Riva's case. The court is, therefore, not authorizing this testing for Riva.

B.    <u>Riva's Letters to Passalacqua Are No Longer Privileged</u>

Riva objects to respondent's reliance on his 1995 letters to his attorney, Mr. Passalacqua. He argues that these letters are protected by the attorney-client privilege, <u>see</u> Pet'r's Remand Mem. at 20 n.6, and that they "should not be used against him in this litigation," Pet'r's Suppl. Remand Mem. at 3 n.2.

Riva's argument is not meritorious. Riva, acting pro se, disclosed his letters in the Record Appendix to his October 16, 1995 application for direct appellate review by the SJC. See Resp.'s Addendum at 263-66. Under Federal Rule of Evidence 502(c), the attorney-client privilege concerning material disclosed in state court proceedings is deemed waived, unless: the disclosure would not constitute a waiver if made in federal proceedings; or the disclosure is not a waiver under the applicable state law. Riva's disclosure of his letters to Mr. Passalacqua would constitute a waiver if made in federal proceedings, essentially because the waiver was not inadvertent. See Fed. R. Evid. 502(2). The disclosure of the letters is a waiver under Massachusetts law because it was voluntary, it was not unintentional, and it was not limited to testimony about the privileged communications. See Mass. Guide to Evidence §523; see also United States v. Massachusetts Inst. of Tech., 129 F.3d 681, 684 (1st Cir. 1997) ("where the client chooses to share communications outside this magic circle [of people surrounding the attorney], the courts have usually refused to extend the privilege"); Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991) ("voluntary disclosure to a third party of purportedly privileged

communications has long been considered inconsistent with an assertion of the privilege").

Riva cites <u>Bittaker v. Woodford</u>, 331 F.3d 715 (9th Cir. 2003), in support of his argument that his letters to Passalacqua are privileged. His reliance on this authority is misplaced. In <u>Bittaker</u>, a habeas petitioner was deemed to have waived the attorney-client privilege by raising a claim of ineffective assistance of counsel in his petition. The district court issued a protective order precluding the use of the privileged materials for purposes other than litigating the habeas petition, and the Ninth Circuit approved of this protective order. However, the Ninth Circuit stated that such limitations on waivers of the attorney-client privilege are appropriately imposed specifically where the privilege is waived "by implication," namely as a result of allegations that "put[] the lawyer's performance at issue during the course of litigation." 331 F.3d at 718-19. The court explained that:

> Such waivers by implication differ materially from the more traditional express waivers. An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public. . . . [O]nce documents have been turned over to another party voluntarily, the privilege is gone, and the litigant may not thereafter reassert it to block discovery of the information and related communications by his adversaries.

Id. at 719-20. Unlike the petitioner in Bittaker, Riva did not simply make allegations that put the performance of his counsel at issue. Rather, Riva's submission of his letters to Mr. Passalacqua in non-confidential proceedings, and his resulting disclosure of the letters to the Commonwealth, to the state court, and to the public, constituted an "express waiver." This express waiver destroyed the attorney-client privilege, and Riva's letters are, therefore, properly included in the record before the court.

## VII. CERTIFICATE OF APPEALABILITY

The court is required to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing Section 2254 Proceedings, Rule 11(a). A certificate of appealability ("COA") is warranted if a petitioner has made "a substantial showing of a denial of a constitutional right." 28 U.S.C. §2253(c)(3). In other words, a COA should be issued if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and

the case has received full consideration, that petitioner will not prevail." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003).

Where the court determines that a motion is subject to dismissal on procedural grounds, a COA should be issued only if both: (1) the soundness of the court's procedural ruling is debatable, and (2) the petitioner's substantive claim is colorable. See Slack, 529 U.S. at 484-85; Mateo v. United States, 310 F.3d 39, 40 (1st Cir. 2002).

As noted earlier, after the court first denied Riva's Petition in Riva II, it issued a COA. See Aug. 27, 2008 Mem. & Order. The court found, at that time, that each of the substantive grounds presented in the Petition "could represent at least a debatable claim for insufficient assistance of counsel under the Sixth Amendment." Id. at 3. In addition, the court recognized that its decision that equitable tolling is not warranted "could be debatable to reasonable jurists," id., who might debate the implications of Riva's legal filings and of Dr. Brower's medical opinion.

A COA is appropriate now as well. The court's initial determination that Riva's substantive claims are colorable has not been altered by any intervening developments. In addition, although the factual record has been developed substantially since the court's decision in Riva II, reasonable jurists could

debate whether the current record, too, justifies equitable tolling of the period of limitation imposed by 28 U.S.C. §2244(d). As the First Circuit observed, "[i]t is a close call as to whether or not equitable tolling is warranted." Riva III, 615 F.3d at 44.

It is less likely that reasonable jurists could debate whether Riva's claim of actual innocence satisfies the standard articulated by the Supreme Court in Schlup, 513 U.S. at 329, and McQuiggin, 133 S. Ct. at 1933. However, in the circumstances, the court will treat this question, too, as debatable, and will not limit the COA solely to the question of whether equitable tolling is warranted.

VIII. ORDER

In view of the foregoing, it is hereby ORDERED that:

1.  Petitioner James Riva's Petition for Writ of Habeas Corpus Under 28 U.S.C. §2254 is DENIED.

2.  A certificate of appealability is ISSUED as to the denial of the Petition under 28 U.S.C. §2244(d).


                                    /s/ Mark L. Wolf
                              UNITED STATES DISTRICT JUDGE